IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
Case No. 2:23-cv-00058

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br><br>        Plaintiff,<br><br>v.<br><br>DEB HAALAND, Secretary of the Interior; and MARTHA WILLIAMS, Director of U.S. Fish and Wildlife Service,<br><br>        Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. Plaintiff Center for Biological Diversity brings this case against Deb Haaland, Secretary of the Interior, and Martha Williams, Director of the U.S. Fish and Wildlife Service (collectively, the "Service"), for violating the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq*. Specifically, Defendants arbitrarily and capriciously denied the Center's 2016 petition that requested the Service reclassify the Eastern North Carolina Red Wolf Population as "essential" and restrict red wolf shootings by private landowners, pursuant to section 10(j) of the Endangered Species Act ("ESA"). 16 U.S.C. § 1539(j).

2. Although red wolves once roamed much of the eastern United States, today the only wild red wolf population is found in northeastern North Carolina. The red wolf is one of the most endangered species in the world, with only 13 red wolves known to exist in the wild today. The primary threat to the species is human-caused mortality, with shootings and vehicle strikes the leading causes of red wolf deaths in the wild population.

3. On May 24, 2016, the Center filed an emergency petition ("the Petition"), requesting that the Service revise the red wolf 10(j) rule. Among other things, the Petition requested that the Service reclassify the current wild population of red wolves as "essential"

1

and revise the red wolf 10(j) rule to restrict shooting deaths of red wolves by private landowners.

4. In a letter dated January 20, 2023, the Service denied the Center's Petition.

5. The Eastern North Carolina Red Wolf Population is essential to the existence of the red wolf in the wild. With just 13 known individuals in the population, the wild red wolf rests on the knife's edge of extinction. Red wolves deserve the protections the ESA affords to essential populations and must not be needlessly shot by private landowners. The Center therefore seeks an order from the Court declaring that the Service's denial of the Center's Petition was arbitrary and capricious under the APA. 5 U.S.C. § 706(2)(A).

## JURISDICTION AND VENUE

6. This action arises under the APA, 5 U.S.C. §§ 551, 701 *et seq*. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. §§ 2201-2202 (declaratory and further relief), and 5 U.S.C. § 702 (APA).

7. Venue in this Court is proper under 28 U.S.C. § 1391(e)(1) because the only remaining wild population of red wolves occurs in this District and this District houses the Service's Raleigh Ecological Services Field Office, where the Service regularly makes decisions about red wolves. Therefore, a substantial part of the events and omissions giving rise to the claim occurred in the Eastern District of North Carolina.

## PARTIES

8. Plaintiff Center for Biological Diversity ("the Center") is a 501(c)(3) nonprofit corporation headquartered in Tucson, Arizona and incorporated in the State of California that maintains offices across the country, including within the red wolf's historical range, namely, in North Carolina, Florida, Virginia, and the District of Columbia. The Center works through science and law to advocate for the protection of rare species within the United States and

abroad. The Center has 84,324 active members, including thousands who live, travel, or recreate within the red wolf's current or historical range.

9. The Center places a high priority on the protection and recovery of the red wolf across its historical range. For example, apart from petitioning the Service in May of 2016 to revise the red wolf's 10(j) rule, on December 8, 2016, the Center was joined by a coalition of wildlife groups in petitioning the Service to revise its outdated red wolf recovery plan. Thereafter, on November 19, 2019, the Center filed a lawsuit that successfully challenged the Service's failure to revise the recovery plan. Pursuant to that litigation, the Service published a final plan this year.

10. The Center's members – including its Board, staff, and other members – live, work, recreate, study, and otherwise use and enjoy areas throughout the red wolf's current and historical range in the lower 48 states. In such areas, the Center's members frequently engage in research, hiking, camping, boating, wildlife watching, and photography, and these experiences would be enriched by having more red wolves on the landscape. The Center's members also enjoy learning about red wolves and rely on the Center for information about red wolves. They will continue to do so in the future.

11. Some of the Center's members have seen red wolves and signs of red wolves in the wild. For example, Center member Ron Sutherland has been visiting the Alligator River National Wildlife Refuge to observe wild red wolves quarterly since 2015. He has observed red wolves and signs of red wolves every year since 2015, and he has captured evidence of red wolf presence on trail cameras. Mr. Sutherland has traveled with his children to the refuge, where he has enjoyed sharing with them the thrill of seeing a red wolf in the wild. He plans to continue returning to the refuge four times per year to encounter and observe red wolves. He also plans to begin also regularly looking for red wolves in the wild at Pocosin Lakes National Wildlife Refuge.

12. The Center and its members have suffered, and will foreseeably continue to suffer, direct injuries to their recreational, aesthetic, scientific, educational, professional, spiritual, and other interests and activities because of the Service's denial of the Petition. These are actual, ongoing, concrete injuries, traceable to the Service's denial, that would be redressed by the relief requested.

13. Specifically, if the Court declares the Service's denial of the Petition arbitrary and capricious under the APA and requires the Service to make a new essentiality determination for the experimental red wolf population, the population could be reclassified as essential. This would increase protections for the red wolf, thereby increasing the species' chances of survival and recovery in the wild, protecting the Center's and its members' interests in red wolves.

14. Enhanced protections resulting from reclassifying the Eastern North Carolina Red Wolf Population as essential include the requirement that federal agencies engage in section 7 consultation with the Service on any agency action likely to jeopardize the continued existence of the red wolf, even outside of the National Wildlife Refuge System. For example, the U.S. Department of Transportation would need to consult on the construction of a new federal highway through the Albemarle Peninsula that could affect red wolves. As vehicle strikes are a leading cause of red wolf mortality, requiring federal agencies to consult with the Service before taking an action that would increase mortality risks would protect the Center's and its members' interests in viewing red wolves in the wild.

15. Habitat protections may also result from reclassifying the Eastern North Carolina Red Wolf Population as essential. Although the ESA provides that critical habitat cannot be designated for nonessential experimental populations, the Service could designate critical habitat for red wolves if they were designated as an essential experimental population. Critical habitat designations increase knowledge of a species' status and trends, and, as an

4

Case 2:23-cv-00058-D-BM   Document 1   Filed 10/04/23   Page 4 of 16

educational tool, encourage constructive changes in human activity affecting critical habitat. Further, there is a positive correlation between critical habitat designations and the implementation of recovery strategies. Researchers have found that species with designated critical habitat for two or more years appeared more likely to be improving and less likely to be declining than species without it.

16. Additionally, if the Court requires the Service to revise the red wolf 10(j) rule to eliminate the provision that authorizes private landowners to shoot non-offending red wolves, that is likely to educate the Center's members and members of the public regarding lawful protections for this species. Currently, the language of the red wolf 10(j) rule is inconsistent with a federal court ruling and therefore does not accurately provide when red wolves can be killed. Such inconsistency may confuse members of the public and fuel anti-wolf sentiment. Thus, this revision of the red wolf 10(j) rule would protect the Center's and its member's educational, recreational and other interests in red wolves.

17. Defendant DEB HAALAND is the Secretary of the U.S. Department of the Interior. In this capacity, Secretary Haaland directs all business of the Interior Department. She is responsible for making decisions and promulgating rules under the ESA. She is sued in her official capacity.

18. Defendant MARTHA WILLIAMS is the Director of the U.S. Fish and Wildlife Service. The Interior Secretary delegated to the U.S. Fish and Wildlife Service, among other things, the authority to respond to petitions for rulemaking and the responsibility to develop and implement 10(j) rules for terrestrial and freshwater plant and animal species and certain marine species. She is sued in her official capacity.

# BACKGROUND

## Legal Background

**A.**     **Endangered Species Act**

19.     The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Congress passed the ESA specifically "to provide a program for the conservation of … endangered species and threatened species" and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). The ESA defines "conservation" as the "use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary," *id.* § 1532(3), i.e., to bring about the recovery of listed species.

20.     Section 10 of the ESA authorizes the Secretary to release a population of a listed species into the wild outside of its current range as an "experimental population." *Id.* § 1539(j)(2)(A) ("section 10(j)"). Before authorizing the release of an experimental population, the Service must determine that the release of such a population will further the conservation of that species. *Id.* The Service must also determine, based on the "best available information," whether the experimental population "is essential to the continued existence" of the species. *Id.* § 1539(j)(2)(B).

21.     The Service's ESA implementing regulations define an "essential experimental population" as "an experimental population whose loss would be likely to appreciably reduce the likelihood of the survival of the species in the wild." 50 C.F.R. § 17.80(b). "All other experimental populations are to be classified as nonessential." *Id.* Thus, experimental populations may be classified as "essential" or "nonessential."

22. Whether an experimental population is designated as essential or nonessential affects conservation of the species. First, essential experimental populations are treated as threatened species under the ESA in all circumstances, while nonessential experimental populations – unless located within the National Wildlife Refuge System or the National Park System – are treated as species proposed to be listed for the purpose of section 7 consultation. 16 U.S.C. § 1539(j)(2)(C)(i).

23. This means that while federal agencies must consult with the Service under section 7 to ensure that their actions do not jeopardize the continued existence of an essential experimental population, *id.* § 1536(a)(2), federal agencies need only confer with the Service before taking an action that could jeopardize a nonessential experimental population found outside of the National Wildlife Refuge System or the National Park System, *id.* § 1536(a)(4).

24. This distinction creates divergent conservation outcomes. Conferences are "informal discussions" between the action agency and the Service that result in "advisory recommendations." 50 C.F.R. § 402.10(c). In contrast, section 7 consultations are formal proceedings that require the agencies to adhere to specified procedures and timelines, including use of the "best scientific and commercial data available." 16 U.S.C. §§ 1536(a)(2), (b)(1). Consultations may result in a "biological opinion," *id*. § (b)(3)(A), which is a final agency action that may be challenged in court, 5 U.S.C. § 702. Moreover, a biological opinion is accompanied by an incidental take statement, which provides mandatory conservation measures for the action agency to implement. 16 U.S.C. § 1536(o)(2).

25. Furthermore, critical habitat may be designated for essential experimental populations but not for nonessential experimental populations. *Id.* § 1539(j)(2)(C)(ii).

26. Critical habitat, as defined in the ESA, is the "specific areas within the geographical areas occupied by [a listed] species, at the time it is listed … on which are

7
Case 2:23-cv-00058-D-BM   Document 1   Filed 10/04/23   Page 7 of 16

found those physical or biological features [that are] (I) essential to the conservation of the species and (II) which may require special management considerations or protection." *Id.* § 1532(5)(A)(i). Critical habitat may also encompass specific areas outside the geographical area occupied by the species at the time of its listing if such areas have been determined to be essential to the conservation of the species. *Id.* § 1532(5)(A)(ii).

27. Designation of critical habitat requires federal agencies to engage in section 7 consultation with the Service when their actions "may affect" the species' critical habitat. 50 C.F.R. § 402.14; 16 U.S.C. § 1536(a)(2). Thus, critical habitat designation provides threatened and endangered species, including essential experimental populations, with an added layer of protection from actions carried out, funded, or authorized by federal agencies.

28. Because section 10(j) provides that experimental populations be generally treated as threatened species, 16 U.S.C. § 1539(j)(2), the Service is authorized to issue special regulations that govern their management. All such regulations must "provide for the conservation"—i.e., recovery—of such species. *Id.* § 1533(d). The regulations that govern the red wolf experimental population are found at 50 C.F.R. § 17.84(c) ("red wolf 10(j) rule").

29. Among other things, the red wolf 10(j) rule provides that private landowners may kill wolves found on their property if federal attempts to "capture such animals have been abandoned." *Id.* § 17.84(c)(4)(v).

30. In 2018, this court enjoined the Service "from taking red wolves, either directly or by landowner authorization, pursuant to 50 C.F.R. §§ 17.84 (c)(4)(v) and (c)(10) without first demonstrating that such red wolves are a threat to human safety or the safety of livestock or pets." *Red Wolf Coal. v. U.S. Fish & Wildlife Serv.*, 346 F. Supp. 3d 802, 815 (E.D.N.C. 2018). The court reasoned that removal of non-offending wolves was detrimental to the recovery of the species and in violation of the ESA. *Id.*; *see also Red Wolf Coal. v. U.S. Fish & Wildlife Serv.*, 210 F. Supp. 3d 796, 805 (E.D.N.C. 2016).

B.  **Administrative Procedure Act**

31. The APA governs the issuance of proposed and final rules by federal agencies. 5 U.S.C. §§ 551-559.

32. The statute establishes that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." *Id.* § 553(e). It also requires that "within a reasonable time, each agency shall proceed to conclude a matter presented to it." *Id.* § 555(b). Further, the agency must give "prompt notice" of the "denial in whole or in part" of a written petition, together with a "brief statement of the grounds for denial." *Id.* § 555(e).

33. Under the APA's judicial review provision, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." *Id.* § 702.

34. Reviewing courts must "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

**Factual Background**

A.  **The Red Wolf Population in Northeastern North Carolina**

35. The red wolf (*Canis rufus*) is the only wolf species found solely within the United States. Although once abundant across the eastern and south-central United States, the species faced near-extinction by the early 20th century due to intensive predator control programs and habitat degradation and alteration.

36. The red wolf is the world's most endangered wolf and one of the most endangered species on earth. It has been designated as an endangered species since 1967, when it was listed under the Endangered Species Preservation Act of 1966, a precursor to the ESA, as "threatened with extinction." *See* 32 Fed. Reg. 4001 (Mar. 11, 1967).

37. By 1972, the wild red wolf population had been reduced to a small coastal area in southeast Texas and southwest Louisiana. Between 1973 and 1980, the Service captured red wolves in the area to create a captive breeding program.

38. In 1986, the Service established the Eastern North Carolina Red Wolf Population under section 10(j) of the ESA, authorizing the release of an experimental population of red wolves into the Alligator River National Wildlife Refuge. 51 Fed. Reg. 41790 (Nov. 19, 1986). The Service designated the experimental population as "nonessential." 50 C.F.R. § 17.84(c)(1).

39. Between 1987 and 1994, the Service released over 60 adult wolves from the captive breeding program into the area.

40. In 1995, the Service revised the 10(j) rule for the red wolf to authorize additional red wolf killings, among other things. 60 Fed. Reg. 18940 (Apr. 13, 1995).

41. In 2012, scientists estimated that about 120 red wolf individuals formed the experimental population in the five-county area of northeastern North Carolina.

42. Since the population's peak in 2012, its numbers have sharply declined. As of August 2023, there are only 13 red wolves known to survive in the wild population. Furthermore, there were no red wolf pups born in the wild in 2019, 2020, or 2021. The population in northeastern North Carolina is the only wild population of red wolves in the world.

43. Gunshots and vehicle collisions, respectively, are the first- and second-leading causes of death for wild red wolves. Between the years of 1987 and 2020, the Service's Red Wolf Recovery Program documented 457 red wolf deaths, of which 25 percent were caused by gunshot and 19 percent by vehicle strikes. In addition, the Service documented 25 red wolf deaths due to trapping between 2002 and 2020.

44. Hybridization with coyotes, which is exacerbated by human-caused mortality, is also a key cause of the wild red wolf population's decline.

**B.  The Service's Denial of the Center's Petition to Revise the Red Wolf's 10(j) Rule**

45. To stem the rapid decline of the experimental red wolf population, on May 24, 2016, the Center submitted the Petition to Defendants pursuant to the APA. 5 U.S.C. § 553(e).

46. The Petition requested that the Service revise the red wolf 10(j) rule to reclassify the experimental population of red wolves as "essential." The Petition explained that the wild population qualifies as "essential" because only one wild population exists. Moreover, wild populations are subject to natural evolutionary processes and therefore have unique – and essential – genetics.

47. The Petition also requested that the Service revise the red wolf 10(j) rule to remove the authorization for killing of non-offending red wolves by private landowners. The Petition explained that the Service has issued permits to private landowners to kill red wolves that have not been involved in any conflicts with pets or livestock.

48. For example, the Service issued a permit in 2015 for a landowner to kill a red wolf that had not exhibited any problem behaviors. The private landowner shot and killed the wolf, a denning mother wolf who had previously mothered a total of 16 pups through four separate litters. No effort was made to locate her pups and their fate is unknown.

49. In a letter dated January 20, 2023, the Service denied the Center's Petition to revise the red wolf 10(j) rule.

50. The Service's denial of the Petition has legal consequences, specifically, by affecting the protections afforded the red wolf under the ESA. Because the Service's January 20, 2023, response unequivocally denies the Petition, it marks the consummation of the Service's decisionmaking.

51. Thus, the Service's denial of the Center's Petition is final agency action that can be challenged as arbitrary and capricious under the APA. 5 U.S.C. §§ 702, 706(2)(A); *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

52. In denying the Center's request that the Service reclassify experimental red wolf populations as essential, the Service stated it was "not required to revisit the essentiality determination for the population because it was not authorizing a release of any population of an endangered species outside the current range of such species," citing 16 U.S.C. § 1539(j)(2)(A) and (B), and "[a]ccordingly, we decline to do so here." The Service did not state that it lacks the legal authority to revisit the essentiality determination in response a petition submitted under 5 U.S.C. § 553(e), which confers on interested persons the "right to petition for the issuance, amendment, or repeal of a rule," 5 U.S.C. § 553(e).

53. The only other reason suggested by the Service for refusing to "revisit the essentiality determination" is that the nonessential determination provides "management flexibilities" that "were necessary to obtain public support for attempts to reintroduce red wolves." However, neither the ESA nor the Service's implementing regulations provide that the determination of whether an experimental population should be designated as essential depends on considerations of management flexibilities or public support. 16 U.S.C. § 1539 (j)(2)(B) (providing that the Service must determine "on the basis of the best available information, whether or not such population is essential to the continued existence of an endangered species or a threatened species"); 50 C.F.R. § 17.80(b) (defining an "essential experimental population" as "an experimental population whose loss would be likely to appreciably reduce the likelihood of the survival of the species in the wild"); H.R. Conf. Rep. No. 97-835, 97th Cong., 2nd Sess., at 34 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2860, 2875 ("In making the determination, the Secretary shall consider whether the loss of the experimental population would be likely to appreciably reduce the likelihood of survival of

that species in the wild. If the Secretary determines that it would, the population will be considered essential to the continued existence of the species.").

54. In fact, the Service considered – and rejected – language that would have incorporated other considerations into the regulatory definition of essential. 49 Fed. Reg. 33885 (Aug. 27, 1984) ("Although it is true that 'likelihood of survival in the wild' may not be the only factor to be considered in determining essentiality and other factors could be applied, the Service chooses to abide by the language in the statute and not expand the scope of essentiality beyond 'likelihood of survival.'").

55. The need for administrative flexibility to generate public support motivated Congress's addition of section 10(j) to the ESA to provide for *experimental* populations (not nonessential experimental populations, specifically). H.R. Conf. Rep. No 97-835, at 34, *reprinted in* 1982 U.S.C.C.A.N. at 2875 (explaining that the amendment would "give greater flexibility to the Secretary in the treatment of experimental populations); *see also* 60 Fed. Reg. at 18945 ("The resolution was to provide new administrative flexibility for selectively applying the prohibitions of the Act to experimental populations.… These provisions were necessary to obtain public support for attempts to reintroduce red wolves and were, therefore, an essential ingredient in success at reestablishment of the species."). In contrast, the determination of whether to designate any specific experimental population as essential is based on whether "best available information" shows that loss of that population "would be likely to appreciably reduce the likelihood of the survival of the species in the wild." 16 U.S.C. § 1539(j)(2)(B); 50 C.F.R. § 17.80(b).

56. Moreover, despite different on-the-ground conditions for red wolves and new science published since the Service's initial designation as nonessential, the Service has provided no factual evidence that designation as nonessential *continues* to be justified to generate public support for red wolves. In fact, recent studies have found that reduced legal

13

Case 2:23-cv-00058-D-BM   Document 1   Filed 10/04/23   Page 13 of 16

protections for wolves increases poaching, refuting the outdated premise that government-sanctioned wolf killing raises human tolerance for surviving wolves. *See, e.g.*, Francisco J. Santiago-Ávila et al., *Evaluating how management policies affect red wolf mortality and disappearance*, R. Soc. Open. Sci. 9(5): 210400 (2022).

57. In denying the Center's request that the Service revise the red wolf 10(j) rule to remove the language authorizing killing of non-offending red wolves by private landowners, the Service stated that this provision "has effectively already been removed" by the 2018 court decision.

58. Even after that court decision, the red wolf 10(j) rule remains unchanged in the Code of Federal Regulations, as well as on the Service's website.

59. That the text of the red wolf 10(j) rule does not accurately dictate the circumstances when the public can lawfully kill red wolves may lead to misinformation and fuel anti-wolf sentiment.

## CLAIM FOR RELIEF

**Arbitrary and capricious denial of the Center's 2016 Petition in violation of the APA**

60. Plaintiff incorporates the above allegations as if set forth in full below.

61. Only one known population of red wolves survives in the wild – the experimental Eastern North Carolina Red Wolf Population. In August 2023, there were only 13 known and collared red wolves in the population. With so few individuals alive, the red wolf is at severe risk of extirpation in the wild.

62. The experimental red wolf population is designated as "nonessential." The Center's 2016 Petition requested that the red wolf population be reclassified as "essential." The Petition provided extensive legal and factual reasons for the reclassification. The Service summarily denied the request without providing any reasonable, non-arbitrary grounds for doing so. The Service did not suggest that it lacks the authority to reclassify at this time and

14
Case 2:23-cv-00058-D-BM   Document 1   Filed 10/04/23   Page 14 of 16

the sole additional reason proffered for not granting the Petition—i.e., the purported need for administrative flexibility to generate public support—is legally baseless and unsupported by the best available information.

63. The Eastern North Carolina Red Wolf Population must be reclassified as "essential" because the loss of the world's only wild population "would be likely to appreciably reduce the likelihood of the survival of the species in the wild." 50 C.F.R. § 17.80(b). In fact, this loss would be *certain* to reduce the likelihood of the survival of the species in the wild, along with the wild population's unique and irreplaceable genetics.

64. The red wolf 10(j) rule provides that private landowners may kill red wolves – including red wolves that have exhibited no conflicts with livestock or other problematic behaviors – if federal attempts to "capture such animals have been abandoned." *Id*. § 17.84(c)(4)(v). The Center's Petition requested a revised 10(j) rule that would remove this authorization for private landowners to kill non-offending red wolves. The Service denied the request.

65. The red wolf 10(j) rule must be revised because it is inconsistent with a subsequent federal court ruling, which held that authorizing private landowners to kill red wolves that did not pose "a threat to human safety or the safety of livestock or pets" was detrimental to the species' recovery and in violation of the ESA. *Red Wolf Coal.*, 346 F. Supp. 3d at 815; *Red Wolf Coal.*, 210 F. Supp. 3d at 805. That the text of the red wolf 10(j) rule does not accurately dictate the circumstances when the public can lawfully kill red wolves may lead to misinformation and fuel anti-wolf sentiment.

66. The Service's denial of the Center's Petition was therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Declare that Service has arbitrarily and capriciously denied the Center's Petition requesting that the Service reclassify the Eastern North Carolina Red Wolf Population as "essential" and revise the red wolf 10(j) rule to prohibit killing of non-offending red wolves by private landowners;

2. Remand for the Service to provide a further response to the Center's Petition in accordance with instructions and a timetable established by the Court;

3. Order that the Service issue a revised red wolf 10(j) rule by a reasonable date certain;

4. Award the Center the costs of this action, including reasonable attorneys' fees, as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412; and

5. Grant such additional relief as the Court deems just and proper.

DATED: October 4, 2023

Respectfully submitted,

*/s/ Collette L. Adkins*
Collette L. Adkins (MN Bar No. 035059X)
Center for Biological Diversity
P.O. Box 595
Circle Pines, MN 55014-0595
(651) 955-3821
cadkins@biologicaldiversity.org

*/s/ Perrin W. de Jong*
Perrin W. de Jong (NC Bar No. 42773)
Center for Biological Diversity
P.O. Box 6414
Asheville, NC 28816
(828) 252-4646
perrin@biologicaldiversity.org

*Attorneys for Plaintiff*