IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:23-CV-00058-BO-BM

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | |
| Plaintiff, | **THE CENTER'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| DEB HAALAND, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

SUMMARY OF THE NATURE OF THE CASE.................................................................... 1

STATEMENT OF THE FACTS ........................................................................................... 3

   I.    The Tiny Wild Red Wolf Population in Northeastern North Carolina .......................... 3

   II.   The Service's Denial of the Center's Petition to Revise the Red Wolf's 10(j) Rule..... 4

STANDARD OF REVIEW ................................................................................................... 6

ARGUMENT ....................................................................................................................... 7

   I.    The Service Arbitrarily Refused to Redesignate the Eastern North Carolina Red Wolf Population as "Essential" ............................................................................................. 8

       A.    The Service's Own Regulations Compel a Finding that the Red Wolf's Only Wild Population is "Essential"................................................................................ 8

       B.    Existence of a Captive Population Does Not Make the Wild Population "Nonessential" ........................................................................................................ 9

       C.    The Service's Desire for "Administrative Flexibility" Cannot Drive its Essentiality Determination................................................................................... 11

       D.    The Service Cannot Continue to Rely Upon the Decades-old Essentiality Determination and Its Outdated Science............................................................. 13

       E.    Designation of North Carolina's Wild Red Wolves as "Essential" Would Further the ESA's Conservation Purpose ...................................................................... 16

   II.   The Service Unreasonably Refused to Revise the Red Wolf 10(j) Rule to Prohibit Private Individuals from Killing Nonoffending Red Wolves ..................................... 18

   III.   The Court Should Order the Service to Reconsider its Denial of the Petition ........... 22

CONCLUSION.................................................................................................................. 22

CERTIFICATE OF COMPLIANCE .................................................................................. 23

CERTIFICATE OF SERVICE .......................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
515 U.S. 687 (1995)................................................................................................16

*Casa De Md. v. U.S. Dep't of Homeland Sec.*,
924 F.3d 684 (4th Cir. 2019) ...................................................................................7

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)..................................................................................................7

*Ctr. for Biological Diversity v. Jewell*,
No. CV-15-00019-TUC-JGZ (l), 2018 U.S. Dist. LEXIS 56436
(D. Ariz. Mar. 31, 2018) ......................................................................13, 14, 18, 20

*Guardians v. U.S. Fish & Wildlife Serv.*,
No. 21-2864 (RDM), 2024 U.S. Dist. LEXIS 159398 (D.D.C. Sep. 5, 2024) ........11, 13, 17

*Hoffler v. Hagel*,
122 F. Supp. 3d 438 (E.D.N.C. 2015) ......................................................................7

*Hunt v. Wash. State Apple Adver. Comm'n*,
432 U.S. 333 (1977)..................................................................................................8

*Kisor v. Wilkie*,
588 U.S. 558 (2019)................................................................................................10

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024)............................................................................................10

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)..................................................................................................8

*Mejia-Velasquez v. Garland*,
26 F.4th 193 (4th Cir. 2022) ..................................................................................10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983)................................................................................7, 11, 16, 21

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
556 F.3d 177 (4th Cir. 2009) ...................................................................................7

*Red Wolf Coal. v. U.S. Fish & Wildlife Serv.*,
210 F. Supp. 3d 796 (E.D.N.C. 2016) .......................................................6, 16, 21

*Red Wolf Coal. v. U.S. Fish & Wildlife Serv.*,
346 F. Supp. 3d 802 (E.D.N.C. 2018) ...................................................2, 6, 19, 21

*Sierra Club v. U.S. Army Corps of Eng'rs*,
909 F.3d 635 (4th Cir. 2018) .................................................................................10

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978)................................................................................................16

*Trout Unlimited v. Lohn*,
559 F.3d 946 (9th Cir. 2009) .................................................................................17

*United States v. Menasche*,
348 U.S. 528 (1955)................................................................................................10

*Wilson v. Thomas*,
   43 F. Supp. 3d 628 (E.D.N.C. 2014) ...................................................................8

**Statutes**

5 U.S.C. § 553(b)(4)(B) ..........................................................................................19
5 U.S.C. § 553(e) ..............................................................................................5, 13
5 U.S.C. § 702 .......................................................................................................17
5 U.S.C. § 706(2)(A) ............................................................................................2, 7
16 U.S.C. § 1531(b) .........................................................................................16, 17
16 U.S.C. § 1532(5)(A)(i) ......................................................................................17
16 U.S.C. § 1533 ....................................................................................................16
16 U.S.C. § 1533(d) ...........................................................................................3, 11
16 U.S.C. § 1536(a)(2) ...........................................................................................17
16 U.S.C. § 1536(b)(3)(A) ......................................................................................17
16 U.S.C. § 1536(o)(2) ...........................................................................................17
16 U.S.C. § 1539(j) ...................................................................................................1
16 U.S.C. § 1539(j)(2) ............................................................................................11
16 U.S.C. § 1539(j)(2)(A) ........................................................................................3
16 U.S.C. § 1539(j)(2)(B) .........................................................2, 3, 8, 12, 14
16 U.S.C. § 1539(j)(2)(C) ...................................................................................3, 17
16 U.S.C. § 1539(j)(2)(C)(i) ...................................................................................17

**Federal Regulations**

50 C.F.R. Part 17, Subpart H ...................................................................................9
50 C.F.R. § 17.11 ...................................................................................................18
50 C.F.R. § 17.80(b) ..............................................................2, 3, 8, 9, 10, 12, 18
50 C.F.R. § 17.81(c)(2) ..............................................................................2, 12, 14
50 C.F.R. § 17.84 ...................................................................................................18
50 C.F.R. § 17.84(c) ..................................................................................2, 3, 6, 19, 20
50 C.F.R. § 17.84(c)(1) ............................................................................................4
50 C.F.R. § 17.84(c)(4)(v) .................................................................................18, 21
50 C.F.R. § 402.14 .................................................................................................17

**Federal Register**

32 Fed. Reg. 4001 (Mar. 11, 1967).........................................................................3
49 Fed. Reg. 33885 (Aug. 27, 1984)....................................................9, 12, 13, 14

51 Fed. Reg. 41790 (Nov. 19, 1986)................................................................1, 3, 4, 12

60 Fed. Reg. 18940 (Apr. 13, 1995) ...........................................................................4

82 Fed. Reg. 20284 (May 1, 2017) ............................................................................20

87 Fed. Reg. 39348 (July 1, 2022).............................................................................20

## Legislative Materials

H.R. Rep. No. 95-1625, 95th Cong., 2d Sess. (1978), *reprinted in*
    1978 U.S.C.C.A.N. 9453 .....................................................................................17

H.R. Rep. No. 97-567, 97th Cong., 2nd Sess. (1982), *reprinted in*
    1982 U.S.C.C.A.N. 2807 .....................................................................................12

H.R. Rep. No. 97-835, 97th Cong., 2nd Sess. (1982) (Conf. Rep.), *reprinted in*
    1982 U.S.C.C.A.N. 2860 .................................................................................10, 11

## State Laws & Regulations

15A N.C. ADMIN. CODE 10I.0102(h)(4).............................................................2, 6, 20, 21

15A N.C. ADMIN. CODE 10I.0104(b)(5)(C) ................................................................21

39 N.C. Reg. 573-74 (Nov. 1, 2024)...........................................................................20

N.C. GEN. STAT. § 113-136 ........................................................................................21

N.C. GEN. STAT. § 113-331(6)....................................................................................21

N.C. GEN. STAT. § 113-337 ........................................................................................21

## Other Authorities

Fed. R. Civ. P. 56(a) ..................................................................................................6

## SUMMARY OF THE NATURE OF THE CASE

Plaintiff Center for Biological Diversity (the "Center") brought this case against Defendants Deb Haaland, Secretary of the Interior, and Martha Williams, Director of the U.S. Fish and Wildlife Service (collectively, the "Service"), for violating the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq*. Specifically, the Service arbitrarily and capriciously denied the Center's 2016 petition (the "Petition") that requested the agency redesignate the northeastern North Carolina red wolf population as "essential" and restrict red wolf shootings by private landowners, pursuant to section 10(j) of the Endangered Species Act ("ESA"). 16 U.S.C. § 1539(j).

Although red wolves once roamed much of the eastern United States, wild red wolves can now only be found in northeastern North Carolina. *See* Center's Statement of Uncontested Facts ("SOUF") ¶ 1. This tiny reintroduced red wolf population faces extirpation primarily due to shootings and vehicle strikes. SOUF ¶ 12. In 2016, to help conserve this highly imperiled species in the wild, the Center filed its Petition asking that the Service revise the red wolf's management rule issued under section 10(j). SOUF ¶ 15. In a short letter dated January 20, 2023, the Service denied the Center's Petition ("Denial"). SOUF ¶ 20.

The Service largely deflected the Center's request that the Service redesignate the experimental red wolf population by simply refusing to "revisit" its original designation from 1986, SOUF ¶ 21, which justified lesser protections for the wild population based on the secured future of the *captive* red wolf population. 51 Fed. Reg. 41790 (Nov. 19, 1986). The Service also stated that its original designation of the population as "nonessential" provides "management flexibilities" – i.e., lesser protections – preferred by the agency. SOUF ¶ 21. Finally, the Service refused to revise the red wolf 10(j) rule to remove language authorizing private landowners to kill red wolves that have not exhibited any problem behaviors. SOUF ¶ 25. The Service acknowledged that a 2018 decision by this Court invalidated that provision,

*Red Wolf Coal. v. U.S. Fish & Wildlife Serv.*, 346 F. Supp. 3d 802, 815 (E.D.N.C. 2018) (*"Red Wolf Coal. II"*), but the Service never revised the red wolf 10(j) rule consistent with that ruling. 50 C.F.R. § 17.84(c).

The Eastern North Carolina Red Wolf Population is truly essential to the existence of the red wolf in the wild. With just 16 known individuals in the population, the wild red wolf rests on the knife's edge of extinction. SOUF ¶ 11. Rather than deny the Petition based solely on the existence of a captive red wolf population, the Service should have applied the regulatory definition of "essential experimental population," which turns on the likelihood of survival of the species "in the wild." 50 C.F.R. § 17.80(b). Consistent with the ESA's mandate that this inquiry use the "best available information," the Service should have also considered the current body of scientific knowledge on the wolves, which has drastically changed in the nearly four decades since its promulgation of the red wolf 10(j) rule in 1986. 16 U.S.C. § 1539(j)(2)(B); 50 C.F.R. § 17.81(c)(2).

Moreover, it is inexcusable that the Service has refused to revise the red wolf 10(j) rule to reflect this Court's decision, which enjoined provisions of the rule allowing private landowners to kill wolves. *See Red Wolf Coal. II*, 346 F. Supp. 3d at 815. With those unlawful provisions still appearing in the Code of Federal Regulations, the public may be misinformed and red wolves needlessly shot. Moreover, North Carolina's recently updated state regulations refer to the invalidated federal rule provision to specify when red wolves may be killed. 15A N.C. ADMIN. CODE 10I.0102(h)(4) (incorporating 50 C.F.R. § 17.84(c) by reference). This creates the risk that state law enforcement officers may refrain from pursuing state criminal prosecution for landowners who unlawfully killed nonoffending red wolves.

Thus, as further explained below, the Court should hold that the Service's Denial was arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A), and grant the Center's Motion for Summary Judgment.

**I.     The Tiny Wild Red Wolf Population in Northeastern North Carolina**

The world's only remaining wild red wolf population survives in northeastern North Carolina. SOUF ¶ 1. Once common across the southeastern United States, intensive predator control programs and habitat degradation decimated its populations by the early 20th Century. *Id*.

The red wolf has been designated as an endangered species since 1967, when it was listed under the Endangered Species Preservation Act of 1966, a precursor to the ESA. *See* 32 Fed. Reg. 4001 (Mar. 11, 1967). At that time, the wild red wolf population had been reduced to a small coastal area in southeast Texas and southwest Louisiana. SOUF ¶ 2. Between 1973 and 1980, the Service captured red wolves in the area to create a captive breeding program. *Id*.

To further species conservation, section 10(j) of the ESA authorizes the Secretary to release a population of a listed species into the wild outside of its current range as an "experimental population." 16 U.S.C. § 1539(j)(2)(A). In 1986, the Service established the "Eastern North Carolina Red Wolf Population" under section 10(j) of the ESA, authorizing the release of an experimental population of red wolves into the Alligator River National Wildlife Refuge. 51 Fed. Reg. 41790.

Because section 10(j) provides that experimental populations be generally treated as "threatened" species, 16 U.S.C. § 1539(j)(2)(C), the Service is authorized to issue special regulations that govern their management. *Id*. § 1533(d). The regulations that govern the red wolf experimental population are found at 50 C.F.R. § 17.84(c) ("red wolf 10(j) rule").

Section 10 directs the Service to determine, based on the "best available information," whether the experimental population "is essential to the continued existence" of the species in the wild. 16 U.S.C. § 1539(j)(2)(B); 50 C.F.R. § 17.80(b) ("The term 'essential experimental

population' means an experimental population whose loss would be likely to appreciably reduce the likelihood of the survival of the species *in the wild*. All other experimental populations are to be classified as 'nonessential.'") (emphasis added). The Service designated the only red wolf experimental population in the wild as "nonessential." 51 Fed. Reg. 41790; *see* 50 C.F.R. § 17.84(c)(1).

Between 1987 and 1994, the Service released over 60 adult wolves from the captive breeding program into northeastern North Carolina. Compl. ¶ 39 [DE-1]; Answer ¶ 39 [DE-7]. In 1995, the Service revised the red wolf 10(j) rule to authorize additional red wolf killings by people. 60 Fed. Reg. 18940 (Apr. 13, 1995). For example, the revised 10(j) rule allows private individuals to take red wolves on their property "because they fear them or consider them a nuisance." *Id*. at 18943.

The red wolf population peaked in 2012, when scientists estimated that 100 to 120 red wolf individuals comprised the experimental population in the five-county area of northeastern North Carolina. SOUF ¶ 10. Its numbers thereafter sharply declined. *Id*. When this case was filed, there were only 13 red wolves known to be surviving in the wild population. Compl. ¶ 42 [DE-1]; Answer ¶ 42 [DE-7]. Furthermore, no red wolf pups were born in the wild in 2019, 2020, or 2021. SOUF ¶ 11.

Gunshots and vehicle collisions are the leading causes of death for wild red wolves. SOUF ¶ 12. Between 1987 and 2020, the Service's Red Wolf Recovery Program documented 457 red wolf deaths, of which 25 percent were caused by gunshot and 19 percent by vehicle strikes. SOUF ¶ 13. Hybridization with coyotes, which is exacerbated by human-caused mortality, is also a key cause of the wild red wolf population's decline. SOUF ¶ 14.

## II.    The Service's Denial of the Center's Petition to Revise the Red Wolf's 10(j) Rule

To stem the rapid decline of the experimental red wolf population, on May 24, 2016, the Center submitted its Petition to the Service pursuant to the APA. SOUF ¶ 15. The APA

establishes that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e).

The Petition requests that the Service revise the red wolf 10(j) rule to reclassify the Eastern North Carolina Red Wolf Population as "essential." SOUF ¶ 16. The Petition points to the language of section 10(j), the agency's regulations implementing this provision, and a statement of Congressional intent from the enactment of this provision to explain that the experimental population qualifies as "essential" because only one wild population exists. *Id*. Moreover, it explains that wild populations are subject to natural evolutionary processes and therefore have unique – and therefore, essential – genetics. *Id*.

The Petition also requests that the Service revise the red wolf 10(j) rule to remove the authorization for private individuals to kill red wolves that have not been involved in any conflicts. SOUF ¶ 17. The Petition cites to numerous studies and statements by scientists both within and outside the Service who have recommended revision of the red wolf 10(j) rule to address the high rates of gunshot mortality. SOUF ¶ 18.

As one red wolf biologist with the Service explained, the liberalized killing provisions in the 10(j) rule have "greatly hindered our ability to recover red wolves." SOUF ¶ 19. For example, the Service issued a permit in 2015 for a landowner to kill a red wolf that had not exhibited any problem behaviors. *Id*. The private landowner shot and killed the wolf, a denning mother wolf who had previously raised a total of 16 pups through four separate litters. *Id*. No effort was made to locate her pups and their fate is unknown. *Id*.

In a four-page letter dated January 20, 2023, the Service denied the Center's Petition to revise the red wolf 10(j) rule. SOUF ¶ 20. In denying the Center's request that the Service redesignate the experimental red wolf population as essential, the Service stated it was "not required to revisit the essentiality determination for the population because it was not authorizing a release of any population of an endangered species outside the current range of

such species," and "[a]ccordingly, we decline to do so here." SOUF ¶ 21. The only other

justification provided by the Service was that the nonessential determination provides

"management flexibilities" that "were necessary to obtain public support for attempts to

reintroduce red wolves." *Id.*

In denying the Center's request that the Service revise the red wolf 10(j) rule to

remove the language authorizing killing of nonoffending red wolves by private landowners,

the Service stated that this provision "has effectively already been removed" by a 2018 court

decision. SOUF ¶ 25. In 2018, this Court enjoined the Service "from taking red wolves,

either directly or by landowner authorization, pursuant to 50 C.F.R. §§ 17.84 (c)(4)(v) and

(c)(10) without first demonstrating that such red wolves are a threat to human safety or the

safety of livestock or pets." *Red Wolf Coal. II*, 346 F. Supp. 3d at 815. The Court reasoned

that removal of non-offending wolves was detrimental to the recovery of the species and in

violation of the ESA. *Id.*; *see also Red Wolf Coal. v. U.S. Fish & Wildlife Serv.*, 210 F. Supp.

3d 796, 805 (E.D.N.C. 2016) ("*Red Wolf Coal. I*"); SOUF ¶ 26.

Yet even after that court decision, the red wolf 10(j) rule remains unchanged in the

Code of Federal Regulations, 50 C.F.R. § 17.84(c), as well as on the Service's red wolf

website. SOUF ¶ 27. As a result, this rule is also reproduced as a part of the North Carolina

Wildlife Resources Commission's newly updated red wolf management regulations. 15A

N.C. ADMIN. CODE 10I.0102(h)(4) (incorporating 50 C.F.R. § 17.84(c) by reference).

## STANDARD OF REVIEW

Summary judgment is appropriate when there is "no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In a claim brought under the APA, a court "does not resolve factual questions, but instead

determines whether or not as a matter of law the evidence in the administrative record

permitted the agency to make the decision it did." *Hoffler v. Hagel*, 122 F. Supp. 3d 438, 446 (E.D.N.C. 2015).

In particular, the APA provides that a court shall set aside agency action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard requires a reviewing court to consider whether the agency:

> …relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

Although a deferential standard, the court must still engage in a "searching and careful" inquiry. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *see Casa De Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 703 (4th Cir. 2019). The goal is to understand "the choices open to the agency and those made," *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192-93 (4th Cir. 2009), and to decide whether the agency's choices were "the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52.

## ARGUMENT

The Service's Denial of the Center's Petition was arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706(2)(A), for multiple reasons. First, the Service arbitrarily refused to redesignate the experimental population of wild red wolves in northeastern North Carolina as "essential," even though the agency's unambiguous regulatory definition compels this outcome. Second, the Service must revise the red wolf 10(j) rule to comport with this Court's previous order, which enjoined provisions allowing the unjustified take of red wolves

that have not been involved in conflicts, but has not done so. As such, the Court should grant the Center's Motion for Summary Judgment.[1]

## I.    The Service Arbitrarily Refused to Redesignate the Eastern North Carolina Red Wolf Population as "Essential"

### A.    The Service's Own Regulations Compel a Finding that the Red Wolf's Only Wild Population is "Essential"

Experimental populations may be classified as "essential" or "nonessential." 16 U.S.C. § 1539(j)(2)(B). The Service's regulations implementing the ESA define an "essential experimental population" as "an experimental population whose loss would be likely to appreciably reduce the likelihood of the survival of the species *in the wild*." 50 C.F.R. § 17.80(b) (emphasis added).

Applying this regulatory definition to the red wolf, the Center's Petition asked the Service to designate the only wild red wolf population as "essential." SOUF ¶ 16. When the Center filed its Petition with the Service, at least 45 red wolves were surviving in the remaining wild population. *Id*. Now, only 16 are known to live in that sole wild population. SOUF ¶ 11.

The loss of the world's only wild red wolf population would be *certain* – not just "likely" – to reduce the likelihood of the survival of the species in the wild. 50 C.F.R. § 17.80(b). Simply stated, if no wild wolves remain, they do not survive in the wild. Therefore, the one remaining wild population must, by definition, be deemed "essential." Moreover, the

---

[1] The Center has standing to bring this lawsuit because it has members who regularly look for, observe, study, and appreciate red wolves in the wild, and whose interests are accordingly compromised by the Service's Denial, and the Court can partially redress these harms by remanding to the Service to reconsider the Petition or ordering the Service to revise its regulations consistent with its prior ruling. *See generally* Sutherland Decl.; Compl. ¶¶ 8-16 [DE-1]; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562-63 (1992) ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."); *Wilson v. Thomas*, 43 F. Supp. 3d 628, 632 (E.D.N.C. 2014) (finding standing where "the organization represents the interests of constituents who would otherwise have standing") (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343-47 (1977)).

loss of the wild population would be truly devasting to red wolf conservation. It cannot be disputed that every one of the few remaining, genetically unique, wild wolves are irreplaceable. Also, the wild population is subject to a natural evolutionary process that may increase genetic diversity and help to ensure that the wolf can survive and recover in the wild. SOUF ¶ 16.

### B. Existence of a Captive Population Does Not Make the Wild Population "Nonessential"

Rather than apply its own regulatory definition of "essential" to determine whether the red wolf's experimental population qualifies, the Service's Denial points to the 1986 finding made when it first designated the red wolf as an experimental population. At that time, the Service found that designation as "nonessential" was appropriate "because the species was secured *in captivity* such that the population was not essential to the species' continued existence." SOUF ¶ 7.

The Service's focus on the captive red wolf population has improperly ignored the status of the wild population as required by the regulatory definition of "essential." Again, the definition's key phrase – "in the wild" – makes clear that the essentiality determination turns on the status of the wild population, not the captive population. 50 C.F.R. § 17.80(b).

The Service's 1986 designation of the red wolf experimental population as "nonessential" is especially baffling because the Service's regulations implementing section 10(j) – which define essentiality in terms of survival "in the wild" – were promulgated just two years earlier. 49 Fed. Reg. 33885 (Aug. 27, 1984) (promulgating 50 C.F.R. Part 17, Subpart H—Experimental Populations). In that rulemaking, the Service rejected comments requesting that all experimental populations be designated as "nonessential." The agency explained that "[w]here the biological facts support an essential designation, the Service intends to make this determination." *Id*. The Service further criticized those comments for "ignor[ing] Congressional intent in explaining the 'essential' determination." *Id*. (quoting

H.R. Rep. No. 97-835, 97th Cong., 2nd Sess., at 34 (1982) (Conf. Rep.), *reprinted in* 1982 U.S.C.C.A.N. 2860, 2875) ("In making the determination, the Secretary shall consider whether the loss of the experimental population would be likely to appreciably reduce the likelihood of survival of that species *in the wild*.") (emphasis added).

Rather than address the obvious inconsistency between its 1986 "nonessential" determination for the red wolf and its longstanding regulatory definition, the Service's Denial doubles down by again relying on the fact that the species is "secured in captivity." SOUF ¶ 7. That cannot stand. The Service's own longstanding regulatory definition requires that the Service make this determination based on the status of the wild population. The Court affords no respect to an agency's "improper interpretation of a decidedly unambiguous regulation." *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 651 (4th Cir. 2018); *see Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2251 (2024) ("As the Court recently noted, interpretive issues arising in connection with a regulatory scheme 'may fall more naturally into a judge's bailiwick' than an agency's.") (citing *Kisor v. Wilkie*, 588 U.S. 558, 578 (2019)); *id*. at 574-75 ("[A] court should not afford *Auer* deference unless the regulation is genuinely ambiguous. If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means – and the court must give it effect, as the court would any law.") (internal citations and quotations omitted). Moreover, a court "cannot adopt a reading of a regulation that renders part of it superfluous over one that gives effect to its 'every clause and word.'" *Mejia-Velasquez v. Garland*, 26 F.4th 193, 208 (4th Cir. 2022) (cleaned up) (quoting *United States v. Menasche*, 348 U.S. 528, 538-39 (1955)). Because the Service's reading ignores the regulation's key clause – "in the wild," 50 C.F.R. § 17.80(b) – the Court must reject that reading.

In a case challenging the Service's designation of a Wyoming experimental population of black-footed ferrets as "nonessential," the court held that the Service cannot

rely on "the captive population alone." *Guardians v. U.S. Fish & Wildlife Serv.*, No. 21-2864 (RDM), 2024 U.S. Dist. LEXIS 159398, at *79 (D.D.C. Sep. 5, 2024). However, because the Service there examined the "likelihood of future survival of the ferret rangewide" – with at least 418 breeding adults at 23 reintroduction sites across the ferret's "range in wild" – the court upheld the ferret's nonessential determination. *Id*. at *81-82.

Here, in looking to the captive population and failing to consider the precarious status of the wild red wolf population, the Service has relied on a factor "which Congress has not intended it to consider" and "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. As such, the agency's determination is arbitrary and capricious, and the Court should vacate the agency's Denial and remand for consideration of the status of the wild red wolf population.

### C. The Service's Desire for "Administrative Flexibility" Cannot Drive its Essentiality Determination

The Service's only other justification for its determination of non-essentiality is equally baseless. The Service's Denial refers to "the management flexibilities that result from the non-essential determination." SOUF ¶ 21; *see also id.* (explaining that the 1982 amendments to the ESA "provide new administrative flexibility for selectively applying the prohibitions of the Act to experimental populations.").

There is no doubt that the need for administrative flexibility motivated Congress's addition of section 10(j) to the ESA to provide for reintroduction of "experimental populations." H.R. Rep. No. 97-835, at 34, *reprinted in* 1982 U.S.C.C.A.N. at 2875 (explaining that the ESA amendments would "give greater flexibility to the Secretary in the treatment of experimental populations").[2] In contrast, however, the determination of whether

---

[2] Section 10(j) authorizes the Service to issue special regulations that govern the management of experimental populations. 16 U.S.C. § 1539(j)(2); *see id*. § 1533(d). When the Service promulgated the 10(j) rule for the red wolf in 1986, the agency explained that the "whole

any particular experimental population qualifies as "essential" or "nonessential" cannot be driven by such considerations. The essentiality determination is a biological inquiry: whether the loss of the experimental population "would be likely to appreciably reduce the likelihood of the survival of the species in the wild." 50 C.F.R. § 17.80(b).

The Service's regulations provide no support for the agency's assertion that the essentiality determination depends on considerations of administrative or management flexibility. They require that the Service determine whether the loss of the experimental population would reduce "the likelihood of the survival of the species in the wild" "based solely on the best scientific and commercial data available, and the supporting factual basis…." 50 C.F.R. §§ 17.80(b), 17.81(c)(2); *see also* 16 U.S.C. § 1539(j)(2)(B) (providing that the essentiality determination must be made "on the basis of the best available information"). In fact, the Service considered – and rejected – language that would have incorporated other considerations into the regulatory definition of "essential." 49 Fed. Reg. at 33890 ("Although it is true that 'likelihood of survival in the wild' may not be the only factor to be considered in determining essentiality and other factors could be applied, the Service chooses to abide by the language in the statute and not expand the scope of essentiality beyond 'likelihood of survival.'").

Only two courts have interpreted this regulatory provision, and both held that the essentiality determination must be a "biological" inquiry. *Ctr. for Biological Diversity v. Jewell*, No. CV-15-00019-TUC-JGZ (l), 2018 U.S. Dist. LEXIS 56436, at *63-64 (D. Ariz.

---

intent of the experimental population provision of the Act is to eliminate the requirement for absolute protection of reintroduced animals, in order to foster the chances of reintroduction." 51 Fed. Reg. at 41794; H.R. Rep. No. 97-567, 97th Cong., 2nd Sess., at 34 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2834) ("For example, the release of experimental populations of predators, such as red wolves, could allow for the taking of these animals if depredations occur or if the release of these populations will continue to be frustrated by public opposition."). The availability of such reduced protections under 10(j) rules applies to all "experimental" populations, not just "nonessential" ones.

Mar. 31, 2018) (holding that the Service's decision to maintain the Mexican wolf population's nonessential status without consideration of the best available information was arbitrary and capricious because "[t]his is a fundamentally biological inquiry and requires the agency to consider existing circumstances and science"); *Guardians*, 2024 U.S. Dist. LEXIS 159398, at *71-76 (upholding the nonessential determination for an experimental population of black-footed ferrets because the Service "used the best available scientific and commercial data to make a biological finding that the Wyoming 10(j) populations were nonessential").

In short, the Service cannot allow its preference for administrative and management flexibilities – in other words, lesser wolf protections – to drive its essentiality determination, which must be based on the biological status of the species in the wild.

### D. The Service Cannot Continue to Rely Upon the Decades-old Essentiality Determination and Its Outdated Science

The Service largely deflected the Petition's request by stating that the agency is "not required to revisit the essentiality determination" from 1986 because the agency is not planning a new reintroduction outside the red wolf's current range. SOUF ¶ 21. Notably, the Service did not state in its Denial that it lacks the legal authority to revisit the essentiality determination in response a petition submitted under 5 U.S.C. § 553(e). Nor could it. The APA confers on interested persons the "right to petition for the issuance, amendment, or repeal of a rule," 5 U.S.C. § 553(e).

Indeed, it has long been the Service's position that it may revisit its essentiality determination. When the Service proposed regulations to implement section 10(j), some commenters suggested that "once a population has been designated nonessential and reintroduced into the wild, reclassification to essential and/or endangered status should not be permitted." 49 Fed. Reg. at 33887. In response, the Service clarified that it retained the authority to change the designation. *Id*. It stated that "[t]he Service cannot categorically state

that such reclassification will never occur; however, the Service deems it highly unlikely that any such action would proceed without full cooperation with the affected parties." *Id.*

Thus, it is no surprise that the Service has previously indicated, with respect to the experimental population of Mexican wolves, that it *could* (but would not) change the designation from "nonessential" to "essential." *See Ctr. for Biological Diversity v. Jewell*, 2018 U.S. Dist. LEXIS 56436, at *27 ("FWS indicated that it did not intend to change the population's status to 'essential' and could foresee 'no likely situation which would result in such changes in the future.'").

In the case challenging the Service's revised 10(j) rule for the Mexican wolf, the court faulted the agency for maintaining the nonessential designation without making findings regarding the current state of the Mexican wolf experimental population. The Service had instead relied on findings it made in 1998, when circumstances were markedly different. *Id.* at *57-65. The court explained:

> In sum, in deciding to maintain the 1998 essentiality determination, [the Service] failed to account for or consider the present circumstances of the experimental population. Although it is for the agency to interpret and weigh the facts, adopting a decision made 17 years prior without explanation does not satisfy the agency's duty to base its decision on the best available science and information or to articulate a rational connection between the facts found and the conclusion reached. Accordingly the Court finds that the agency's decision to maintain the Mexican wolf's nonessential status in the 2015 rulemaking was arbitrary and capricious.

*Id.* at *65-66.

Here too, the Service cannot evade its responsibility to "base its decision on the best available science and information" by pointing to the red wolf's long-outdated finding from 38 years ago. *See id.*; 16 U.S.C. § 1539(j)(2)(B) (requiring that essentiality determinations be made "on the basis of the best available information."); 50 C.F.R. § 17.81(c)(2) (requiring that the essentiality finding be "based solely on the best scientific and commercial data available, and the supporting factual basis"). Yet the Service's Denial provides no factual

evidence that the nonessential designation currently generates public support for red wolves, as it has asserted in the past.

In fact, the best available science refutes the agency's premise that reduced protections for wolves increases public tolerance for wolves. In a chapter of a book on wildlife management published this year, scientists examined dozens of studies to evaluate the claim that reduced protections for wolves increases public tolerance for wolves. SOUF ¶ 22. They found no support for that claim, and in fact found "substantial evidence of a counter-productive effect on tolerance." *Id.*; *see also id.* ("Therefore, an overwhelming body of evidence contradicts the suggestion that liberalizing wolf-killing would lessen poaching or intolerance.").

For example, a 2021 study of Mexican wolves found that "Mexican wolves were 121% more likely to disappear during periods of reduced protections than during periods of stricter protections." SOUF ¶ 23. And a 2020 study of wolves in Wisconsin found that "poachers killed more wolves and concealed more evidence when the government relaxed protections for endangered wolves." *Id*. Scientists have hypothesized that lowered protections for wolves "send a signal to would-be poachers that wolves are low in value, or that the government needs the support of poachers to control wolf populations." *Id*.

Illegal killing of red wolves by poachers remains a primary extinction threat for the species. SOUF ¶ 24 ("[O]ur results show a small group of people are driving the species to extinction through poaching."). While it is true that people with positive attitudes toward red wolves have lower inclinations to poach them, *id.*, the Service is wrong to assert that reduced protections for red wolves will increase public tolerance for them. A 2021 study that examined public attitudes towards red wolves in and around the 5-county recovery area found that the agency needs to focus on "[i]ncreased communication and relationship building" –

not fewer wolf protections – to "reach the very small group willing to violate social norms by poaching." *Id.*

At bottom, the Service has a duty to provide a nonarbitrary response to an APA rulemaking petition requesting action within its legal authority. The reviewing court must then ensure that the agency's choices were "the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52. Rather than supply a reasoned explanation for its Denial, the Service simply pointed to its outdated and indefensible finding from 1986. The agency ignored the facts developed since the reintroduction program's inception 38 years ago. It also ignored the science on how reduced protections for wolves can lead to more poaching, which is a primary threat to red wolf conservation. Consistent with the ESA's requirement that the agency apply the best available information to its essentiality determinations, the Court should require the Service to grapple with the current situation for red wolves and the other circumstances discussed in the Center's Petition.

### E. Designation of North Carolina's Wild Red Wolves as "Essential" Would Further the ESA's Conservation Purpose

The reasonableness of the Service's refusal to designate the only remaining wild red wolf population as "essential" must be assessed in light of the ESA's purpose, which is "to provide a program for the conservation of … endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA's conservation purpose "is reflected not only in the stated policies of the Act, but in literally every section of the statute." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 699 (1995) (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978)); *see also Red Wolf Coal. I*, 210 F. Supp. 3d at 803. The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Hill*, 437 U.S. at 180.

The Act's conservation purpose is achieved through recovery of species in the wild, not presence in zoos or other captivity. 16 U.S.C. § 1533; *see, e.g.*, *Trout Unlimited v. Lohn*,

559 F.3d 946, 957 (9th Cir. 2009) ("[T]he ESA's primary goal is to preserve the ability of natural populations to survive in the wild."). Indeed, Congress intended the ESA to "provide a means whereby the *ecosystems* upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b) (emphasis added); *see* H.R. Rep. No. 95-1625, 95th Cong., 2d Sess., at 5 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9453, 9455 (providing that the purpose of ESA is not only to reduce threats to the species' existence, but "to return the species to the point where they are viable components of their ecosystems.").

Moreover, designation of an experimental population as "essential" or "nonessential" has practical, on-the-ground impacts for species conservation. If the experimental population is deemed "essential," the species receives more protections under the ESA, including section 7 consultations[3] for federal actions that may affect members of the experimental population, as well as designation of critical habitat.[4] 16 U.S.C. § 1539(j)(2)(C). In contrast, critical habitat cannot be designated for nonessential populations, and members of nonessential populations are afforded full section 7 protections only within the National Wildlife Refuge system and the National Park system. *Id*. § 1539(j)(2)(C)(i); *see Guardians*, 2024 U.S. Dist. LEXIS 159398, at *11 ("Designation as a nonessential experimental population has

---

[3] Consultation may result in a biological opinion, 16 U.S.C. § 1536(b)(3)(A), which is a final agency action that serves as an authorization for certain activities with potential impacts to listed species, and that may be challenged in court, 5 U.S.C. § 702. Moreover, a biological opinion is accompanied by an incidental take statement, which provides mandatory conservation measures for the action agency to implement. 16 U.S.C. § 1536(o)(2).

[4] Critical habitat includes the "specific areas within the geographical area occupied by [a listed] species, at the time it is listed … on which are found those physical or biological features [that are] (I) essential to the conservation of the species and (II) which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i). Designation of critical habitat requires federal agencies to engage in section 7 consultation with the Service when their actions "may affect" the species' critical habitat. 50 C.F.R. § 402.14; 16 U.S.C. § 1536(a)(2). Thus, critical habitat designation provides threatened and endangered species, including essential experimental populations, with an added layer of protection from actions carried out, funded, or authorized by federal agencies.

17

significant implications."). In short, the red wolf experimental population would benefit from life-saving ESA protections if it were redesignated as essential.

Nevertheless, the Service has *never* applied the "essential" designation to an experimental population of *any* species. *See* 50 C.F.R. §§ 17.11, 17.84; *Ctr. for Biological Diversity v. Jewell*, 2018 U.S. Dist. LEXIS 56436, at *18. It appears that the Service's preference for lesser protections for reintroduced populations has outweighed the ESA's conservation purpose. This has disturbing ramifications for current and future red wolf reintroductions, as well as for experimental reintroduction efforts for other imperiled species.

In summary, the wild red wolf population in northeastern North Carolina meets the definition of an "essential" experimental population, and the Service has the authority to redesignate it as such in response to the Center's Petition. 50 C.F.R. § 17.80(b). Yet the Service ignored its own regulatory definition and summarily denied the Petition without providing any reasonable, nonarbitrary grounds for doing so. The Service cannot simply point to its finding from 1986 that the captive red wolf population is secure, as that argument is legally baseless. Plus, the agency's purported need for administrative flexibility to generate public support is an irrelevant consideration for the essentiality determination, and it is unsupported by modern science. As such, the Court should grant the Center's Motion for Summary Judgment.

## II. The Service Unreasonably Refused to Revise the Red Wolf 10(j) Rule to Prohibit Private Individuals from Killing Nonoffending Red Wolves

The red wolf 10(j) rule provides that private landowners may kill red wolves – including red wolves that have had no conflicts with domestic animals or other problematic behaviors – if federal attempts to "capture such animals have been abandoned." 50 C.F.R. § 17.84(c)(4)(v).

The Petition requested a revised red wolf 10(j) rule that would remove this authorization for private landowners to kill nonoffending red wolves. SOUF ¶ 17. The

Petition explained that scientists both within and outside the Service have repeatedly recommended revision of the 10(j) rule to address the high rates of gunshot mortality. SOUF ¶ 18. The Petition highlighted a particularly troubling example of the Service authorizing a landowner to kill a denning mother wolf who had previously raised four separate litters without exhibiting any problem behaviors. SOUF ¶ 19.

The Service denied the Center's request to revise the red wolf 10(j) rule to remove this harmful provision. The Service stated that this provision "has effectively already been removed" by a prior court decision. SOUF ¶ 25; *see Red Wolf Coal. II*, 346 F. Supp. 3d at 815 (enjoining the Service "from taking red wolves, either directly or by landowner authorization, pursuant to 50 C.F.R. §§ 17.84 (c)(4)(v) and (c)(10) without first demonstrating that such red wolves are a threat to human safety or the safety of livestock or pets.").

The Service did not address the fact that the text of red wolf 10(j) rule remains unchanged since this Court's decision. The Service never revised the red wolf 10(j) rule, 50 C.F.R. § 17.84(c), in response to the Court's order enjoining the Service from implementing that provision. Such a rule revision would have been an uncomplicated process, as the agency would not have had to provide prior notice and opportunity for public comment. 5 U.S.C. § 553(b)(4)(B) (providing exceptions to the APA's requirement for notice and comment rulemaking when "impracticable, unnecessary, or contrary to the public interest").

Furthermore, the Service's refusal to revise the red wolf 10(j) rule to remove the unlawful provisions is inconsistent with the Service's prior practice of revising 10(j) rules in response to other court orders. For example, in 2018, the U.S. District Court for the District of Arizona remanded the Mexican wolf 10(j) rule to the Service to remedy the deficiencies the court identified, including the agency's arbitrary and capricious refusal to consider redesignating the Mexican wolf experimental population as "essential," as discussed above.

*See Ctr. for Biological Diversity v. Jewell*, 2018 U.S. Dist. LEXIS 56436, at *27. The Service subsequently revised that 10(j) rule to comply with the court order. 87 Fed. Reg. 39348, 39350 (July 1, 2022) ("We developed the rule to comply with the District Court of Arizona remand … of our 2015 10(j) rule for the Mexican wolf …."); *see also, e.g.*, 82 Fed. Reg. 20284 (May 1, 2017) (rescinding the 10(j) rule for an experimental population of Wyoming gray wolves to comply with a court order delisting them).

That the text of the 10(j) rule does not accurately dictate the circumstances when the public can lawfully kill red wolves may lead to confusion, misinformation, and needless killings. A search for the text of this rule, 50 C.F.R. § 17.84(c), on Google or legal databases pulls up the unlawful rule provisions. Even the Service's own website provides a link to the now-enjoined text of the red wolf 10(j) rule, SOUF ¶ 27, which provides no explanation or clarification to the reader to alert them to the Court's injunction.

To demonstrate the risk of confusion, consider the new regulations adopted by the North Carolina Wildlife Resources Commission ("the Commission") in October 2024, governing state management of red wolves in North Carolina. The regulation explicitly references allowances for red wolf killings in the 10(j) rule without any indication that the Court enjoined provisions of that rule. It provides:

> The species listed in Rules .0103, .0104, and .0105 of this section may be taken or possessed without a permit when . . . an individual is taking or harassing a red wolf (Canis rufus) pursuant to the conditions in 50 C.F.R. 17.84(c), hereby incorporated by reference, including subsequent amendments and editions . . .

15A N.C. ADMIN. CODE 10I.0102(h)(4); *see* 39 N.C. Reg. 573-74 (Nov. 1, 2024).

In responding to the Center's Petition, the Service should have considered the risk that retaining the invalidated provisions of the red wolf 10(j) rule in the Code of Federal Regulations could bring about additional unlawful killings due to confusion among the public and state wildlife management officials about when red wolves may be lawfully killed. Indeed, given the unrevised regulatory language, state law enforcement officers would likely

refrain from pursuing state criminal prosecution for landowners who unlawfully killed nonoffending red wolves.[5] Making matters worse, such lack of law enforcement only further emboldens poachers and could result in even more illegal killings. *See, e.g.*, SOUF ¶ 24.

As such, the Service has again "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. The Service's failure to examine the harm to red wolf conservation from allowing 50 C.F.R. § 17.84(c)(4)(v) − and by extension, 15A N.C. Admin. Code 10I.0102(h)(4) − to remain unrevised notwithstanding this Court's order renders its response to the Petition arbitrary and capricious.

In summary, the red wolf 10(j) rule must be revised because it is inconsistent with this Court's ruling, which held that authorizing private landowners to kill red wolves that did not pose "a threat to human safety or the safety of livestock or pets" was detrimental to the species' recovery and in violation of the ESA. *Red Wolf Coal. II*, 346 F. Supp. 3d at 815; *Red Wolf Coal. I*, 210 F. Supp. 3d at 805. In refusing to revise the red wolf 10(j) rule, the Service failed to consider the impact that perpetuating such misinformation could have on red wolf conservation. Indeed, members of the public may be more likely to kill – without legal justification and without risk of prosecution – the last wild red wolves on Earth, thus exacerbating the risk of extinction for this species in the wild.

As such, its denial of the Petition is arbitrary and capricious, and for this additional reason, the Court should grant the Center's Motion for Summary Judgment.

---

[5] The Commission has law enforcement jurisdiction over all hunting and trapping laws within the North Carolina. N.C. Gen. Stat. § 113-136. The "take" of "any animal on a protected wild animal list" is a Class 1 misdemeanor under North Carolina law. *Id.* § 113-337. The Commission's lists of threatened, endangered, and special concern species in North Carolina are included in the definition of a "protected wild animal list," *id.* § 113-331(6), and the red wolf is listed by the Commission as a threatened species. 15A N.C. Admin. Code 10I.0104(b)(5)(C).

**III.     The Court Should Order the Service to Reconsider its Denial of the Petition**

The Court should hold that the Service arbitrarily and capriciously denied the

Center's Petition and order the agency to remedy this error. The Court should remand to the

agency to provide further response to the Petition's request for redesignation of the red wolf

experimental population as "essential," in accordance with the Court's direction, which

should include a deadline for the agency's response. It should also order the Service to issue a

revised red wolf 10(j) rule – by a reasonable date certain – that removes the provisions that

this Court enjoined.

**CONCLUSION**

For the reasons discussed above, the Center respectfully requests that this Court grant

its Motion for Summary Judgment.


DATED: November 27, 2024          Respectfully submitted,

                                  */s/ Collette L. Adkins*
                                  Collette L. Adkins (MN Bar No. 035059X)
                                  Center for Biological Diversity
                                  P.O. Box 595
                                  Circle Pines, MN 55014-0595
                                  (651) 955-3821
                                  cadkins@biologicaldiversity.org

                                  */s/ Perrin W. de Jong*
                                  Perrin W. de Jong (NC Bar No. 42773)
                                  Center for Biological Diversity
                                  P.O. Box 6414
                                  Asheville, NC 28816
                                  (828) 252-4646
                                  perrin@biologicaldiversity.org

                                  *Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.2(f), the undersigned counsel certifies that this

Memorandum contains 7,220 words, excluding the parts that do not count towards the

limitation as provided in Local Rule 7.2(f)(3). In making this certification, I have relied on

the word count of the word-processing system used to prepare the brief.

DATED: November 27th, 2024        Respectfully submitted,

                                         /s/ Collette L. Adkins
                                         Collette L. Adkins

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2024, I electronically filed the foregoing

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY**

**JUDGMENT** and its attachment with the Clerk of the Court using the CM/ECF system,

which will automatically send notification of such filing to counsel for Defendants.

/s/ Collette L. Adkins
Collette L. Adkins