IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

Case No. 2:23-CV-00058-M-BM

CENTER FOR BIOLOGICAL
DIVERSITY,

      Plaintiff,

v.

DOUG BURGAM,[1] *in his official capacity
as Secretary of the Interior*, et al,

      Defendants.

ORDER

This Administrative Procedure Act ("APA") case was initiated by the Center for Biological

Diversity ("the Center") against the Secretary of the United States Department of the Interior ("the

Department") and the Director of the United States Fish and Wildlife Service ("the Service")

(collectively "the Departments"). The Center alleges that the Service arbitrarily and capriciously

denied its petition to redesignate the experimental red wolf population in Eastern North Carolina

as "essential" under the Endangered Species Act. Pending before the court are the parties' cross-

motions for summary judgment. DE 26, 30. After careful consideration, the court finds that the

Service's denial was not arbitrary and capricious and that the Departments are entitled to judgment

as a matter of law. Accordingly, the Center's Motion for Summary Judgment [DE 26] is denied,

and the Departments' Motion for Summary Judgment [DE 30] is granted.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Doug Burgam and Brian Nesvik are
automatically subsisted for Deb Haaland and Martha Williams as defendants.

## I.    The Endangered Species Act

"In response to growing concern over the extinction of many animal and plant species, Congress enacted the Endangered Species Act of 1973 ("ESA")," codified as amended at 16 U.S.C. § 1531, *et seq.* *Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir. 2000) (internal quotations added).    Finding that species "threatened with extinction" were "of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people[,]" Congress created a regulatory scheme designed to conserve endangered species and the ecosystems upon which they depend. *See* § 1531(a)–(b).  The ESA directs the Secretary of the Interior to "determine whether any species" is "endangered" or "threatened," § 1533(a)(1), and thereafter "develop and implement plans" to promote their conservation. § 1533(f)(1).

The ESA's "cornerstone" provision "prohibits the taking of any endangered species without permit or other authorization." *See Gibbs*, 483 F.3d at 487 (citing § 1538(a)(1)(B)).  The term "take" is defined as "to harass, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." § 1532(19).  The ESA also authorizes the Secretary to issue appropriate regulations as is "necessary and advisable to provide for the conservation" of protected species. § 1533(d).

In 1982, Congress amended the ESA to "increase the Service's flexibility in reintroducing endangered species into portions of their historic range[.]" *See Gibbs*, 214 F.3d at 487; *see also* Pub. L. 97–304, 96 Stat. 1426 (Oct. 13, 1982).  As part of the amendment, Congress added section 10(j), which permits the Service to introduce experimental populations of endangered and threatened species into areas where they no longer reside. § 1539(j)(1), (2)(A).  The experimental population to be released must be "wholly separate geographically from nonexperimental populations of the same species," and the Secretary must determine "that such release will further

2

the conservation of such species." *Id.* Before authorizing the release of an experimental population, the Service must promulgate by regulation a 10(j) rule that identifies the population to be released and determines whether that population "is essential to the continued existence" of that species. § 1539(j)(B). An "essential population" is one "whose loss would be likely to appreciable reduce the likelihood of the survival of the species in the wild." 50 C.F.R. § 17.80(b). "Under the looser standards of section 10(j), members of an experimental population are generally to be treated as threatened rather than endangered." *Gibbs*, 214 F.3d at 487 (citing § 1539(j)(2)(C)).

## II. Undisputed Facts[2]

The material facts necessary to resolve the pending motions are undisputed. The *Canis rufus*, colloquially known as the red wolf, was once common across the southeastern United States. DE 15-5 at FWS 142. But, by the early twentieth century, its population had been decimated by a combination of intensive predator control programs and habitat degradation. *Id.* In 1967, the red wolf was designated as an endangered species by the Fish and Wildlife Service, and by 1972, its range was limited to a small coastal region in southeast Texas and southwest Louisiana. *Id.*; *see* 32 Fed. Reg. 4001-02 (Mar. 11, 1967).

In 1973, to prevent the extinction of the species, the Service began trapping wild red wolves to establish a captive breeding population. DE 15-5 at FWS 143. The program started with fourteen individuals. *Id.* In 1986, the Service established the "Eastern North Carolina Red Wolf Population" pursuant to Section 10(j) of the ESA, which authorized the release of an experimental population into the Alligator River National Wildlife Refuge in Dare County, North Carolina. 51 Fed. Reg. 4179-02 (Nov. 19, 1986). The Service designated the population as non-essential

---

[2] This factual background is derived from the administrative record [DE 15, 24], the parties' respective statements of material facts [DE 27, 32], and the corresponding appendices [DE 29, 33].

because "the species was secured in captivity such that the population was not essential the species' continued existence." *See* DE 15-15 at FWS 177 (citing 49 Fed. Reg. 41790-02); *see also* 50 C.F.R. § 17.84(c)(1) (noting that this red wolf population is a "nonessential experimental population[]").

Between 1987 and 1994, the Service released sixty adult red wolves from the captive breeding population into northeastern North Carolina. DE 27 at ¶ 8; DE 32 at ¶ 8. The population grew to a peak of 100-120 wolves in 2012, but in the following years, that number significantly declined. DE 15-5 at FWS 144. By 2023, only thirteen red wolves were known to exist in the wild, and no red wolf pups were born in the wild from 2019 to 2021. *Id.*; *see also* Compl. DE 1 at ¶ 42; Ans. DE 7 at ¶ 42. The decline of the wild population was caused primarily by human activity. DE 15-5 at FWS 144. Between 1987 and 2020, the Service documented 457 red wolf fatalities in the experimental population. DE 27 at ¶ 13; DE 13 at ¶ 13; *see also Cent. for Biological Diversity v. Bernhardt*, Case No. 2:19-cv-00040-BO, at DE 24-2 (E.D.N.C. Sep. 18, 2020). Of those deaths, twenty-five percent were caused by gunshot wounds, nineteen percent were caused by vehicle strikes, four percent occurred during trapping by the Service, four percent were caused by private trapping, three percent were caused by poisoning, and five percent were caused by suspected illegal takings. *Id.* Interbreeding between red wolves and coyotes is also a significant threat to the experimental population. DE 15-5 at FWS 146.

From 2015 to 2018, the Service temporarily halted management activities (e.g., pup fostering, releases, translocations, and coyote sterilizations) while the recovery program underwent an independent review. DE 33 at 45. In 2019, however, management activities resumed. *Id.* Between 2020 and 2023, twenty-four red wolves were released into the experimental population,

4

and between 2022 and 2023, four litters were born: two in the wild and two in acclimation pens. *Id.*

On May 24, 2016, the Center submitted an "emergency petition" to the Service pursuant to 5 U.S.C. § 553(e). *See* DE 15-4 at FWS 116–34. The petition sought several forms of relief, two of which are at issue in this case. First, the Center requested that the Service "reclassify all reintroduced populations of red wolves as 'essential' experimental populations" under Section 10(j) of the ESA. *Id.* at FWS 116. The Center argued that because the experimental population at Alligator River National Wildlife Refuge was the only wild population of red wolves in existence, it should have been considered "essential" to the species' continued existence. *Id* at FWS 125–26. Second, the Center proposed a revised section 10(j) rule that removed a provision permitting the Service to authorize the lethal taking of red wolves found on private property "after efforts by project personnel to capture such animals [had] been abandoned." *See id.* at FWS 128 (quoting 50 C.F.R. § 17.84(c)(4)(v)). The Center argued that allowing the killing of non-offending wolves "contradicts traditional notions of wildlife management[.]" *Id.* at FWS 128.

On November 4, 2018, while the petition remained pending, United States District Judge Terrance W. Boyle issued an order permanently enjoining the Service "from taking red wolves, either directly or by landowner authorization, pursuant to 50 C.F.R. §§ 17.84(c)(4)(v) and (c)(10) without first demonstrating that such red wolves are a threat to human safety or the safety of livestock or pets." *Red Wolf Coal. v. U.S. Fish & Wildlife Serv.*, 346 F. Supp. 3d 802, 815 (E.D.N.C. 2018).

On January 20, 2023, the Service issued a four-page letter denying the Center's petition in its entirety. DE 15-15 at FWS 176–79. Concerning the Center's request to redesignate the experimental population in Alligator River National Wildlife Refuge, the Service wrote:

5

> [In 1986], we found non-essential status appropriate because the species was secured in captivity such that the population was not essential to the species' continued existence . . . We are not required to revisit the essentiality determination where we are not authorizing the release of any population of an endangered species outside the current range of such species.

*Id.* at FWS 177 (citing 16 U.S.C. § 1539(j)(2)(A)–(B)). It reasoned further that "the management flexibilities that result from the non-essential determination" are "necessary to obtain public support for attempts to reintroduce red wolves," which is "an essential ingredient in reestablishment of the species." *Id.* Regarding the Center's request to amend the section 10(j) rule, specifically as it pertains to § 17.84(c)(4)(v), the Service acknowledged the injunction issued in *Red Wolf Coalition* and stated that the "provision no longer provides an allowance for take separate and apart from 50 C.F.R. § 17.84(c)(4)(iii)." DE 15-15 at FWS 179. It declined to amend the rule, therefore, reasoning that the challenged provision "has effectively already been removed." *Id.*

### III.  Procedural History

The Center initiated this action on October 4, 2023, seeking declaratory and injunctive relief pursuant to the APA. *See* DE 1 at 16. It sought an order (1) declaring that the Service's denial of the Center's 2016 petition was arbitrary and capricious; (2) remanding this case to the Service for further consideration; and (3) directing the Service to issue a revised section 10(j) rule incorporating the interpretive limitations outlined in *Red Wolf Coalition*. *Id.* at 15–16.

The Departments filed the administrative record on March 15, 2024, *see* DE 15, and, on November 7, 2024, at the direction of the court, they filed a supplement. DE 24. The parties then filed cross-motions for summary judgment. DE 26, 30. The appropriate responses were filed, *see* DE 34, 35, and on July 23, 2025, Judge Boyle heard arguments from the parties. *See* DE 38. On August 20, 2025, before an order could be issued, the matter was transferred to the undersigned. DE 39. In this posture, the motions are ripe for review.

6

## IV. Legal Standard

The APA authorizes persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to bring suit in federal court. 5 U.S.C. § 702. A reviewing court must set aside challenged "agency action, findings, and conclusions" if it finds that they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accord with law[.]" 5 U.S.C. § 706(2)(A). "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Env't Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (citations omitted). And while courts must be careful not "to reduce judicial review to a 'rubber-stamp' of agency action," *id.*, neither may they "substitute [their] judgment for that of the agency[.]" *Motor Vehicle Mfr. Ass'n of the United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 30 (1983).

Typically, review under the APA occurs after an agency has engaged in rulemaking of its own volition. But, it may also be triggered when an agency has decided *not* to engage in rulemaking, despite being petitioned to do so by an "interested person." *See* 5 U.S.C. § 553(e); *see also* § 555(e) (providing that when an agency denies such a petition, the associated notice must typically "be accompanied by a brief statement of the grounds for denial"). Where, as here, a plaintiff challenges an agency's decision not to engage in rulemaking, review under the APA is "extremely limited[.]" *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) (quoting *Nat'l Customs Brokers & Forwarders Assn. of Am., Inc. v. United States*, 883 F.2d 93, 96 (D.C. Cir. 1989)). That is so because "an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities." *Massachusetts*, 549 U.S. at 527. That discretion "is at its height" when an agency refuses to act, *see id.*, so agency inaction will be upheld so long as "the agency employed reasoned decision making in rejecting the petition." *Defenders*

7

*of Wildlife v. Gutierrez*, 532 F.3d 913, 919 (D.C. Cir. 2008) (spacing altered); *see also id.* ("[A]n agency's refusal to institute rulemaking proceedings is at the high end of the range of levels of deference we give to agency action under our 'arbitrary and capricious' review.") (internal citations and quotations omitted). Put another way, a reviewing court should only reverse challenged inaction "for compelling cause, such as plain error of law or a fundamental change in the factual premises previously considered by the agency[.]" *WildEarth Guardians v. EPA*, 751 F.3d 649, 653 (D.C. Cir. 2014) (citations and quotations omitted).

"APA claims are 'adjudicated without a trial or discovery, on the basis of the existing administrative record[.]'" *Am. Fed. of Teachers v. Dep't of Educ.*, 796 F. Supp. 34 66, 89 (D. Md. 2025) (quoting *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. Dep't of Transp.*, 524 F. Supp. 2d 642, 659 (D. Md. 2007)). Accordingly, summary judgment under Federal Rule of Civil Procedure 56 is the appropriate "mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Nieves v. McHugh*, 111 F. Supp. 3d 667, 679 (E.D.N.C. 2015) (quoting *Ohio Valley Env't Coal. V. Hurst*, 604 F. Supp. 2d 860, 879 (S.D. W. Va. 2009)).

## V.     Discussion

The parties' cross motions for summary judgment require the court to consider two components of the Service's denial letter: (1) its decision not to redesignate the experimental red wolf population as "essential;" and (2) its decision not to revise the section 10(j) rule to clarify the scope of 50 C.F.R. § 17.84(c)(4)(v). The court addresses each in turn.

8

A.    Essentiality Determination

The Service's decision not to redesignate the experimental red wolf population as "essential" was reached through "reasoned decision making." *See Gutierrez*, 532 F.3d at 919. On this issue, the parties are in significant agreement as to the relevant material facts. The pending motions turn, instead, on the legal positions relied upon by the Service in its denial letter. Specifically, the parties dispute whether an experimental population can be considered "non-essential" on the basis that other members of that species are kept in captivity. *See* DE 28 at 13–23; DE 31 at 13–24. They also disagree on several procedural issues, namely, whether the Center's petition was timely and, if so, whether the Service addressed it with sufficient particularity. *See* DE 31 at 13; DE 34 at 6. The court's analysis of these questions proceeds in two parts. First, the court addresses the Service's argument that the petition is untimely. *See* DE 31 at 13–14. Second, the court considers whether the Service properly relied on its original essentiality determination in denying the Center's petition. *See id.* at 14–19. Because the court answers the second question in the affirmative, it does not reach the parties' arguments concerning the relationship between captive breeding populations and essentiality determinations.

First, the Service argues that the Center's petition is time-barred. DE 31 at 8. Under the APA, all administrative agencies must give "interested person[s] the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). The denial of a petition under this section "constitute[s] a final order reviewable by this court." *N.L.R.B. Union v. Fed. Lab. Rel. Authority*, 834 F.2d 191, 196 (D.C. Cir. 1987) (citation omitted). The Service acknowledges this but argues, nonetheless, that it does not permit judicial review of petitions asserting that a regulation was improper at the time it was initially promulgated. *See* DE 31 at 8. That is incorrect. The court, undoubtedly, cannot substantively revisit the propriety of a forty-year-old regulation,

9

but the Fourth Circuit has "recognized a 'general rule' whereby a party may obtain judicial review of an agency regulation 'once the limitations period has run' by petitioning the agency to amend or rescind the regulation[] and then appealing the agency's decision." *Howard Cnty, Md. v. Fed. Aviation Admin.*, 970 F.3d 441, 449 (4th Cir. 2020) (quoting *Am. Rd. & Transp. Builders Ass'n v. EPA*, 588 F.3d 1109, 1112 (D.C. Cir. 2009)). The rule comes with two limitations. First, the petition may not be "predicated on an alleged procedural defect in the promulgation of the existing regulation"—such as a failure to provide opportunity for public comment. *Howard Cnty.*, 970 F.3d at 449 (cleaned up). Procedural arguments are "viewed as a direct challenge to the original enactment" and are "time-barred" if brought "outside the period in which judicial review of the promulgation is permitted." *Id.* (cleaned up). Second, the scope of review "is limited to the 'narrow issues as defined by the denial of the petition for rulemaking[.]" *N.L.R.B. Union*, 834 F.2d at 196 (quoting *Pro. Drivers Couns. v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1217 n.2 (D.C. Cir. 1983)).

Neither of those limitations are implicated here, and the petition is otherwise timely. Before the agency, the Center challenged the experimental population's non-essentiality status on the grounds that a captive breeding population cannot ensure a species continued existence "in the wild." DE 15-4 at FWS 126. This was a substantive, not procedural, challenge to the regulation. *See Howard Cnty.*, 970 F.3d at 449. Moreover, in the Service's denial letter, it provided several reasons for why it declined to revisit its initial determination. *See* DE 15-5 at FWS 177. The issue is thus properly framed "by the denial of the petition for rulemaking." *See N.L.R.B. Union*, 834 F.2d at 196. Because the Center filed this lawsuit roughly eight-and-a-half months after receiving the Service's denial letter, its petition is timely. *See Corner Post, Inc. v. Bd. of Governors Fed. Reserve Sys.*, 603 U.S. 799, 804 (2024) ("An APA claim does not accrue for purposes of [28

U.S.C.] § 2401(a)'s 6-year statute of limitations until the plaintiff is injured by final agency action.").

While the petition is timely, it is important to clarify what does and does not fall within the scope of the court's "extremely limited" and "highly deferential" standard of review. *See Massachusetts*, 549 U.S. at 527–28. The court cannot, as the Service points out, treat the Center's petition as a functional attack on the 1986 section 10(j) rule. *See* DE 31 at 9. The window to challenge that regulation has long since passed, and to the extent the Center attempts to do so here, it is time-barred. *See Corner Post, Inc*, 603 U.S. at 804. Instead, the court's review is limited to assessing whether the Service's decision not to engage in rulemaking was reasonably and justifiably explained under the present circumstances. The court proceeds with that understanding.

On the merits, the Service maintains that its letter gave "a brief statement of the ground for denial . . . consistent with the requirements of the APA." DE 31 at 9. As recounted above, the Center's § 553(e) petition asked the Service to redesignate the experimental red wolf population as essential on the grounds that its loss would result in the loss of the only wild population of red wolves in existence. DE 15-4 at FWS 126. The Service responded, in relevant part, as follows:

> The [Service] designated the ENC RWP as a "non-essential" experimental population in its 1986 Final Rule on "Determination of Experimental Population Status for an Introduced Population of Red Wolves in North Carolina." At that time, we found non-essential status appropriate because the species was secured in captivity such that the population was not essential to the species' continued existence (51 FR 41790). We are not required to revisit the essentiality determination where we are not authorizing the release of any population of an endangered species outside the current range of such species. 16 U.S.C. § 1539(j)(2)(A), (B). Accordingly, we decline to do so here. Also, to the extent the Petition seems to ask us to consider populations of red wolves that are reintroduced in the future to be essential, we find that decision to be premature. Any future reintroduction of red wolves in a different area will require further rulemaking and an "essentiality" determination at that time.

11

DE 15-15 at FWS 177–78.[3]  The Center argues that this explanation was deficient because under the Service's own regulations, the likelihood of a species' continued existence must be measured by the likelihood that it continues exist in the wild.  DE 28 at 9 (citing 50 C.F.R. § 17.80(b) (defining an "essential experimental population" as "an experimental population whose loss would be likely to appreciably reduce the likelihood of the survival of the species in the wild")).  Under the Center's logic, "if no wild wolves remain, they do not survive in the wild.  Therefore, the only remaining wild population must, by definition, be deemed 'essential.'"  *Id.* at 8.  Because, in the Center's view, the Service's denial letter flowed directly from an erroneous application of law, it was issued in violation of the APA.  *Id.* at 11.  The court disagrees.

Under the applicable statutory scheme, the Service was not required to revisit its essentiality determination.  Pursuant to 16 U.S.C. § 1539, "[b]efore authorizing the release of any [experimental] population," the Service must determine "whether or not such population is essential to the continued existence" of the species.  § 1539(j)(2)(B).  As the statute makes clear, this determination occurs *before* the Service authorizes a population's release outside of its current range—which has not happened here.[4]  *See id.*  From this point on, the designation is fixed, and a set of protections are introduced that govern how local residents are to interact with the newly introduced population of threatened or endangered species.  *See* § 1539(j)(2)(B).  Until such time as the Service authorizes a new release under § 1539(j)(2)(A), under the terms of the statute, the Service is not required to reassess its prior determination.  As applied to this case, because the

---

[3] The Service also referenced the "management flexibilities that result from the non-essential determination[.]"  DE 15-15 at FWS 178.  The parties dispute whether it was proper for the Service to give these flexibilities any consideration.  *See* DE 28 at 11; DE 31 at 14.  Ultimately, because the Service was not required to reconsider its initial determination, the court does not reach these arguments.

[4] The last time the Service authorized the release of red wolves outside their current range was in 1986.  *See* DE 15-15 at FWS 177.

12

Service has not authorized the release of a new population of red wolves outside of its current range, its obligation to make an essentiality determination was not triggered, and it was permissible for it to rely on the rationale articulated in its 1986 designation. *See* § 1539(j)(2)(B).

In response, the Center does not dispute that § 1539 only contemplates that a population is designated at the time it is authorized for release. *See* DE 34 at 3 (noting that § 1539 "is silent on whether the Service must now redo an outdated, erroneous essentiality determination"). Instead, it argues that the Service's past legal positions support the conclusion that, through the use of a § 553(e) petition, the Center can compel the Service to revisit (and potentially change) a prior determination. *See* DE 28 at 13. The court is unpersuaded. It is true that the Service has previously implied that, at least theoretically, it has the authority to change an experimental populations' designation without authorizing a new release.[5] *See Ctr. for Biological Diversity v. Jewell*, No. CV-15-00019-TUC-JGZ, 2018 WL 1586651, at *8 (D. Ariz. Mar. 31, 2018) ("[The Service] indicated that it did not intend to change the population's status to 'essential' and could foresee no likely situation which would result in such changes in the future.") (citations and quotations omitted); *see also* 49 Fed. Reg. 33887 (Aug. 27, 1984) ("The Service cannot categorically state that such reclassification will never occur; however, the Service deems it highly unlikely that any such action would proceed without full cooperation with the affected parties."). Before this court, it does not comment one way or the other; it merely asserts, as the court finds above, that it was entitled to rely on the rationale behind its initial determination. *See* DE 31 at 10. However, even assuming for the sake of argument that the Service had such authority, a petition asking the Service to use it would not trigger the full panoply of requirements under § 1539(j), including, as the Center

───────────────

[5] Any reservation by the Service of its right to revisit an essentiality determination is not binding on or properly presented to the court.

13

emphasizes, the duty to consider "the best available information" bearing on an essentiality determination. *See* § 1539(j)(2)(B). The Service was required simply to provide "a brief statement of the grounds for denial." *See* § 555(e). And where, as here, the Center's argument for redesignation rested on legal conclusions that applied with equal force at the time the petition was filed as it did when the regulation was promulgated, the Service "responded appropriately with a 'brief statement' resting on the final rule's rationale." *See Ark Initiative v. Tidwell*, 749 F.3d 1071, 1076 (D.C. Cir. 2014).

The Center resists this conclusion by likening this case to *Jewell*. *See* DE 28 at 14; DE 34 at 5. That case involved a revised section 10(j) rule for the Mexican wolf. *Jewell*, 2018 WL 1586651, at *9, 19. Through that rule, the Service authorized the release of an experimental population outside of its then-current range. *Id.* The Service designated the population as "non-essential," as it had previously in 1998, reasoning that "because the purpose of the 2015 rule [was] to revise management protocols for an existing population, reconsideration of the population's nonessential status was 'outside the scope' of the rulemaking." *Id.* at *10. The district court found that this was arbitrary and capricious. The court reasoned that because the Service released "an experimental population outside the species' current range[,]" it was required to "perform a new essentiality determination" and "base its decision on the best available science and information." *Id.* at *20–21; *see also* § 1539(j)(2)(A). The Center relies on this language and suggests that the Service was required to do the same here. *See* DE 28 at 14. It was not. Unlike in *Jewell*, the Service has not promulgated a revised section 10(j) rule authorizing the release of red wolves outside their current range. Without such a designation, § 1539(j)'s requirements are not

14

triggered.[6] *See* § 1539(j)(2)(B); *see also Jewell*, 2018 WL 1586651, at \*20–21 (finding the same). So, *Jewell* is inapposite.

The Center has not otherwise identified (and the court has not independently found) a case where the Service has been ordered to reconsider an essentiality determination in this posture— i.e., when no section 10(j) rule has recently been promulgated. *See WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 749 F. Supp. 3d 26, 64 (D.D.C. 2024) (upholding a non-essential designation made in a revised section 10(j) rule for the black-footed ferret); *Ctr. for Biological Diversity v. Haaland*, 774 F. Supp. 3d 1206, 1232 (D. Ariz. 2025) (upholding a non-essential designation made in a revised section 10(j) rule for the Mexican wolf). The governing statute does not contemplate that such an obligation is ever triggered. The Service, therefore, appropriately relied on the rationale underlying its original determination when denying the Center's petition.

To be clear, this order does not make a finding as to whether the red wolves in eastern North Carolina, as it stands today, are essential to the continued survival of the species in the wild. That question is not properly before the court. In this posture, it suffices to find merely that the Center's § 553(e) petition was not the appropriate tool to compel the Service to reconsider its decision. Accordingly, the court finds that Service's denial letter was the product of "reasoned decision making." *See Gutierrez*, 532 F.3d 913, 919. Under the level of deference required of this court, that is all that is required.

---

[6] Because of this, the Service was not required to independently examine the "best available information" and justify, in its denial letter, why a non-essential determination remained appropriate. *See* § 1539(j)(2)(B). The Service's decision not to reference scientific data was also supported by another more fundamental reason: the Center did not rely on factual evidence in its emergency petition. *See* DE 15-4 at FWS 126. The Center argued that the non-essential designation was wrong the day it was issued, relying on its interpretation of a governing regulation. *See id.* The Service confronted that argument in its denial letter; it was not required to address other arguments not properly presented to it.

15

B. Revised Taking Rule

The Service also reasonably declined to amend § 17.84(c)(4)(v) to expressly incorporate the parameters of the *Red Wolf Coalition* injunction. *See id.* Presently, the red wolf's section 10(j) rule includes the following language:

> Any private landowner may take red wolves found on his or her property in the areas defined in paragraphs (c)(9) (i) and (ii) of this section after efforts by project personnel to capture such animals have been abandoned, *Provided* that the Service project leader or biologist has approved such actions in writing and all such taking shall be reported within 24 hours to the Service project leader or biologist, the refuge manager (for the red wolf population defined in paragraph (c)(9)(i) of this section), the Park superintendent (for the red wolf population defined in paragraph (c)(9)(ii) of this section), or the State wildlife enforcement officer for investigation.

§ 17.84(c)(4)(v). The Service was enjoined from authorizing lethal takings under this provision "without first demonstrating that such red wolves are a threat to human safety or the safety of livestock or pets." *Red Wolf Coalition*, 346 F. Supp. 3d at 815. The Center asked the Service to amend the rule to include this language, but the Service declined. In so doing, the Service stated that the language of the injunction "effectively . . . removed" the taking provision because it "no longer provides an allowance for take separate and apart from 50 C.F.R. § 17.84(c)(4)(iii)." DE 15-15 at FWS 179. Before this court, the Center argues that, without the amendment, "the text of the [section] 10(j) rule does not accurately dictate the circumstances when the public can lawfully kill red wolves" and "may lead to confusion, misinformation, and needless killings." DE 28 at 20. The court disagrees.

*Red Wolf Coalition* neither explicitly nor implicitly required the Service to amend its regulations. The court, instead, held that the Service's *interpretation* of § 17.84(c)(4)(v) violated the ESA because it "impermissibly broaden[ed] the scope of wolves subject to take authorizations, and therefore, conflict[ed] with the ESA's 'purpose to protect endangered and threatened' species." *Red Wolf Coalition*, 346 F. Supp. 3d at 812 (quoting *Hill v. Coggins*, 867 F.3d 499, 510

16

(4th Cir. 2017)). More specifically, the court found that interpreting the rule to allow for the lethal taking of red wolves not specifically determined to be a threat to the safety of humans, pets, or livestock was "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *Motor Vehicle Mfr. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The injunction issued reflected that. Accordingly, the Service was only estopped from authorizing a taking without first making one of two findings; the regulation itself stood unaffected. *Red Wolf Coalition* did not, therefore, require the Service to amend the regulation.

The Center also argues that the Service's refusal to amend the rule is "is inconsistent with [its] prior practice of revising 10(j) rules in response to other court orders." DE 28 at 19. For support, it relies on *Jewell*, where the district court remanded a section 10(j) rule to the Service for further action so that it could "issue[] a new final rule for the experimental population of Mexican gray wolves, or otherwise remed[y] the deficiencies identified in" the court's order. *Jewell*, 2018 WL 1586651, at *23. The Service later issued a revised rule "to comply with the . . . remand." *See* 87 Fed. Reg. 39349 (July 1, 2022). Contrary to the Center's position, this does not evidence a "practice" whereby the Service automatically engages in rulemaking anytime a court order bears on how a regulation can be interpreted. Here, unlike in *Jewell*, the court did not invalidate or remand the section 10(j) rule. Instead, the court found that a claimed interpretive power did not exist and, accordingly, that two take authorizations issued under that interpretation conflicted with the "plain language of the red wolf 10(j) rule." *See Red Wolf Coalition*, 346 F. Supp. 3d at 812. The section 10(j) rule in this case has not changed, so, as before, *Jewell* is inapposite.

Finally, the Center argues that the current regulation will lead to confusion and, potentially, the "needless killing[]" of red wolves. *See* DE 28 at 20. However, this argument was neither

17

raised in the Center's petition nor properly framed "by the denial of the petition for rulemaking[.]" *See N.L.R.B. Union*, 834 F.2d at 196. Thus, it falls outside the scope of this court's review. It suffices to note that any potential public confusion resulting from the language of the regulation could not end in an unlawful taking because the Service is required to approve, in writing and subject to limitations announced in *Red Wolf Coalition*, any request for a lethal taking made under the rule. *See* § 17.84(c)(4)(v).

All of this said, the Service responded appropriately to the Center's petition. It is true, as the Center points out, that the rationale in the Service's denial letter is somewhat disconnected from the argument made in its briefing. The Service declined the petition, in part, due to its belief that under the *Red Wolf Coalition* injunction, it could no longer authorize a taking "separate and apart from 50 C.F.R. § 17.84(c)(4)(iii)."[7] DE 15-15 at FWS 179. But here, the Service advances a different argument; it argues, as the court found above, that the Center misunderstood the remedy in *Red Wolf Coalition* and that the Service was not required, under its term, to amend the section 10(j) rule. *See* DE 31 at 22. This discrepancy notwithstanding, the denial letter was responsive to the arguments made in the petition. The Center originally sought to amend the rule on the grounds that it led to a "high demand" for the killing of "non-offending wolves." DE 15-4 at FWS 128. The Service accurately responded that after *Red Wolf Coalition*, that is no longer a possibility.

---

[7] The court is not convinced that this is correct. Section 17.84(c)(4)(iii) permits landowners to kill red wolves on their property if they "are in the act of killing livestock or pets." Authorized takings under § 17.84(c)(4)(v), by contrast, do not require a present threat. *See* § 17.84(c)(4)(v). Instead, the Service may authorize a private taking in writing "after efforts by project personnel to capture such animals have been abandoned," *id.*, and the Service determines that the wolf in question poses "a threat to human safety or the safety of livestock or pets." *Red Wolf Coalition*, 346 F. Supp. 3d at 815. There are, therefore, scenarios where a landowner could not take a wolf under § 17.84(c)(4)(iii), but the Service could authorize him to do so under § 17.84(c)(4)(v).

Because the Center's proffered reason for amending the rule was moot, the Service's decision recognizing as much evidenced "reasoned decision making." *See Gutierrez*, 532 F.3d at 919.

## VI.     Conclusion

For these reasons, the court finds that the Service's denial of the Center's petition was not arbitrary and capricious and, thus, that the Departments are entitled to judgment as a matter of law. Accordingly, the Center's Motion for Summary Judgment [DE 26] is DENIED, and the Departments' Motion for Summary Judgment [DE 30] is GRANTED.  The Clerk is DIRECTED to enter judgment in favor of the Departments and thereafter close the case.

SO ORDERED this ___30th___ day of March, 2026.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE